# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

JOSHUA LEE CLOSE, Individually
and as Administrator of the Estate of
Angela Marie Prichard, and COLTON
HANCOCK, individually,

        Plaintiffs,

vs.

CITY OF BELLEVUE, IOWA,
DENNIS SCHROEDER, RYAN
KLOFT, and SHELBY MUTZL,

        Defendants.

No. 24-CV-1012-CJW-KEM

**MEMORANDUM OPINION
AND ORDER**

_____

**TABLE OF CONTENTS**

I.     FACTUAL SUMMARY ................................................................... 3

II.    STANDARD UNDER FEDERAL RULE OF CIVIL PROCEDURE
       12(B)(6) ....................................................................... 9

III.   ANALYSIS................................................................................11

     A.    Due Process .........................................................................11

     B.    Violation of Express Statutes Regarding No Contact Orders ...............26

     C.    Intentional Infliction of Emotional Distress....................................29

     D.    Action on the Bond ...............................................................31

     E.    Iowa Slayer Act ..................................................................33

F.      Trespass on the Case ……………………………………………………34

G.     Loss of Consortium…………………………………………………35

IV.   CONCLUSION…………………………………………………………36

This matter is before the Court on defendants' motion to dismiss. (Doc. 21). Plaintiffs filed a resistance (Doc. 24) and an amended resistance (Doc. 25). Defendants filed a reply. (Doc. 26). This case arose from a brutal and tragic murder of a woman by her estranged husband. He has been convicted of murder and is serving a prison sentence. Plaintiffs, her heirs, seek damages from the City of Bellevue and several of its police officers on the theory that their inaction caused his action. For the following reasons, the Court finds plaintiffs have failed to state cognizable claims against defendants. Defendants' motion to dismiss is **granted**.

## I.    FACTUAL SUMMARY[1]

In November 2019, the State of Iowa charged Christopher Prichard ("Christopher") with First Degree Theft. Christopher was released on bail, and the case was subsequently delayed thirty-one times, leaving Christopher free of custody into at least 2023 with respect to that charge.[2]

---

[1] The facts are taken from plaintiffs' complaint. (Doc. 1). Of course, these are only allegations made by plaintiffs at this stage. To the extent the complaint contains conclusory assertions, and not statements of fact, the Court has omitted them. For example, paragraph 14 of plaintiffs' complaint alleges: "The Defendants intentionally refused to enforce the law against Christopher Prichard and assisted Christopher Prichard avoiding the legal consequences of his unlawful conduct because of Christopher Prichard's personal relationship with one or more of the named Defendants." (Doc. 1, at 4). This is argumentative and conclusory and not a statement of fact. Plaintiffs do not provide any facts that would show a personal relationship between Christopher and defendants except a vague assertion that Christopher "performed electrical services for at least some of the Defendants on a reduced fee or free basis." (Doc. 1, at 12).

[2] The Court has no knowledge of the bases for these continuances or of any other information regarding the theft case, including the outcome of the case. Plaintiffs' assertion that defendants "acquiesced to Christopher getting out on bail and in getting the criminal matter repeatedly delayed" (Doc. 1, at 4) is conclusory and unsupported by any factual allegations that would establish any involvement by any of the defendants in court proceedings. Thus, the Court ignores this conclusory assertion.

3

On April 18, 2022, Christopher was arrested on a domestic violence charge, where the violence was directed at Angela Prichard ("Angela"). A no contact order was issued at some point, but it was terminated on May 3, 2022. (Doc. 1, at 4).

In July or August 2022, Angela located a tracking device in her car and two hidden cameras in her home. Angela notified the Bellevue Police, and the police did not take any action against Christopher. (*Id.*).[3]

On August 23, 2022, Christopher sent "threatening" texts to Angela, including the statement that "it is going to get real fucking ugly." (*Id.*). Angela notified the police, and the police did not take any action against Christopher.

On August 28, 2022, Christopher told Angela that he "will destroy her business." (*Id.*, at 5). Angela notified the police, and the police did not take any action against Christopher.

On August 29, 2022, Christopher called the police and falsely reported that Angela threw a bottle at him and hit him in the face. (*Id.*). The police did not take any action against Christopher.

On September 1, 2022, a Temporary Restraining Order ("TRO") was filed and served on Christopher. The TRO generally barred Christopher from being near Angela and the like. The TRO also included a "firearms warning," which apparently specifically informed police of Christopher's ownership of firearms. The TRO also included the following language: "If [Christopher] violates this order, [Christopher] must be arrested immediately. . . . Only the court can relieve [Christopher] from restrictions listed in this order." (*Id.*).

On September 2, 2022, Angela requested police officers go to her house, and said that she would not be staying at the house until safety cameras were installed. One of

---

[3] Plaintiffs do not specifically allege that Christopher placed the tracking device in the car or that he placed the cameras in the house, but the wording of the complaint implies it.

the officers who Angela contacted was named in the incident report as "BRK1," who plaintiffs believe to be defendant Ryan Kloft. That same day, Christoper was re-served with the TRO filed the day before. Christopher moved out of the house. The police escorted Angela back to the house after Christopher left, but the doors were bolted, the utilities were shut off, and there was "no business phone." (*Id.*, at 6). The home was vandalized, including damage to a keepsake chest and the hall bath, paint on the floor, master bedroom and bath damage, a mattress moved around and smeared with dog poop, and guns moved around the house.[4] The police did not take any action against Christopher.

On September 7, 2022, Angela contacted the police, including "BDS1," who plaintiffs believe is Bellevue police chief and defendant here Dennis Schroeder. Angela reported that Christopher violated the TRO by going to Angela's place of work and cutting the grass. Schroeder told Angela that she needed to contact her attorney and that Schroeder "would do a report." (*Id.*, at 7).

On September 9, 2022, Christopher drove by Angela's house while her pregnant daughter-in-law was visiting, and later "stalked" the daughter-in-law at a gas station. The police "were contacted"—presumably by Angela, but the complaint does not state who contacted the police. The police told Angela that they would contact the county attorney and call Angela back, but the police did not do so.

In the "next few days" following September 9, 2022, Christopher repeatedly drove past Angela's house, including driving past six times in one hour on one night. This was reported to the police. The police did not take any action against Christopher.

On September 11, 2022, Christopher was driving around in a white pick-up truck, which was not his "usual vehicle," and drove around Colton Hancock's house at 11:00

---

[4] Plaintiffs do not allege in the complaint that the officers were aware of or observed the shut off utilities, the missing business phone, or the damage to the house.

PM.  (*Id.*).  Hancock is Angela's son and a plaintiff here.  Angela believed that she had seen Christopher drive the white pick-up right past her at some point prior to September 11.  Somebody reported this to the police.  The police did not take any action against Christopher.

On September 12, 2022, Christopher went to Angela's house to complain about credit cards Christopher believed Angela had opened in his name.  (*Id.*, at 8).  The police were contacted, and defendant Shelby Mutzl responded.[5]  Mutzl and the police apparently did not take any action against Christopher.

On September 13, 2022, Angela provided Kloft text messages sent from Christopher to Angela, apparently in violation of the TRO.

On September 14, 2022, Christopher informed Kloft that Angela had a boyfriend.  Kloft did not take any action against Christopher.

On September 15, 2022, Christopher left a note to Angela on the steps of Angela's home.  On that same day, Kloft arrested Christopher for violation of the TRO after being shown a text message sent from Christopher to Angela.  Allegedly, someone advised Kloft that "this is a mandatory arrest."  The complaint does not include who advised Kloft that it was a "mandatory arrest."  (*Id.*, at 8).  Christopher spent the night in jail stemming from the arrest.  The following day, the court entered an order requiring Christopher to appear in court on September 23, 2022, for a hearing on the violation.  (*Id.*, at 9).[6]

---

[5] It is unclear if this means Mutzl arrived at the scene or answered the phone.  The Court takes plaintiffs' allegation here to mean Mutzl arrived at the scene.

[6] The complaint states the date as September 29, 2022, but this appears to be a typographical error.  (Doc. 1, at 9).  It appears the initial date was September 23, 2022, which was later rescheduled to September 29, 2022, when Christopher failed to appear on the earlier date.  (*Id.*, at 10).

6

At some point in September 2022, Christopher placed signs making negative comments about Angela in the store window of a shop which Christopher apparently owned, which was on a main street and in full public view. On September 17, 2022, Angela notified the police of the signs. Mutzl went to the shop and observed the signs. Mutzl and the police did not take any action against Christopher. Mutzl told Angela that she should contact the county attorney "about a restraining order against" Christopher.

Also on September 17, 2022, Angela told Mutzl that Christopher was parked close by and watching her. Mutzl saw Christopher's jeep in a nearby parking lot, and saw the jeep drive past while Mutzl and Angela were talking. Mutzl stated that it was dark out and that she "was unable to observe if the driver was [Christopher] or not." (*Id.*, at 9–10). Mutzl did not take any action against Christopher.

Also on September 17, 2022, somebody saw Christopher spying on Angela while Christopher was hiding in a lumberyard near Angela's sister's house, where Angela was staying. This was reported to the police at least two times. The police did not take any action against Christopher. (*Id.*, at 10).

On September 18, 2022, Angela provided Kloft a copy of the note Christopher had left on Angela's steps three days prior. (*Id.*, at 8). Kloft told Angela initially that she could not prove it was Christopher. Kloft also stated that he would "tell [Christopher] to knock it off." (*Id.*).

On September 19, 2022, Angela took pictures of the signs posted in Christopher's shop and provided copies to the police. The police did not take any action against Christopher. (*Id.*, at 10).

On September 23, 2022, Christopher did not show up at a hearing on the restraining order violation despite Mutzl reminding Christopher of the hearing. Nobody informed the state court that Mutzl had reminded Christopher of the hearing. (*Id.*). At some point, Christopher spoke to someone in the "clerk's office," telling that person he

7

was "unclear of the hearing date" and that he had "contacted the Bellevue Police Department who told him the date for this hearing was 9/29/22." (*Id.*). The hearing on the restraining order violation was rescheduled for September 29, 2022.

Also on September 23, 2022, Christopher showed up where Angela was staying and told a number of people that he did not care if he went to jail. (*Id.*, at 10). The complaint does not identify these people. Plaintiffs also allege that Christopher followed and harassed Angela on this date, but provides no additional factual detail. The police were notified of this. The police did not take any action against Christopher.

At some point after the TRO was in place (the complaint does not state when), Angela pulled into a gas station in Bellevue. While Angela was pumping gas, Christopher pulled in next to her and stared at her. Angela called the police and reported it. The police did not take any action, but told Angela "it's a small town, you will have that." (*Id.*, at 7).

On September 29, 2022, Christopher did not show up for the rescheduled hearing on the restraining order violation. The state court sentenced Christopher to six days in jail, with credit for the one day previously served, for the restraining order violation. Christopher was given one day to turn himself in. (*Id.*, at 11).

On September 30, 2022, Christopher did not turn himself in. A warrant for Christopher's arrest was filed. The police did not arrest Christopher at that time. (*Id.*).

On October 1, 2022, Angela told the police that she intended to move back into the house and asked the police to keep an eye out because of threats from Christopher. Schroeder went to the house and "informed [Angela] that she should wait on moving back into her house" because Schroeder was afraid that Christopher was going to hurt Angela or himself. (*Id.*, at 11–12).

On October 7, 2022, the TRO was made permanent, meaning it became a permanent restraining order at that time. The restraining order included the following

language: "Any peace officer with probable cause to believe [Christopher] has violated this order must immediately arrest [Christopher]," citing Iowa Code Sections 236.11(1) and 664A.6. (*Id.*, at 6).

On October 8, 2022, just before 8:00 AM, the Jackson County Sheriff's Office responded to a 9-1-1 call at Angela's workplace, the Mississippi Ridge Kennels, in Bellevue. When the officers arrived, they found Angela dead from a gunshot wound to the chest. (*Id.*, at 12).

On October 9, 2022, at 12:30 AM, the police located Christopher, who had the murder weapon and ammunition in his possession. Christopher has since been convicted of first-degree murder for killing Angela. In the murder trial, Christopher admitted shooting Angela, but claimed that it was an accident—that is, he claimed that he did not mean to pull the trigger. (*Id.*).

Christopher had performed electrical services for "at least some of the [d]efendants on a reduced fee or free basis." (*Id.*). The complaint does not say when or specifically for whom Christopher provided these services.

Plaintiffs brought suit against defendants, bringing several claims, which will be discussed in more detail below. Defendants moved to dismiss plaintiffs' complaint for failure to state a claim. (Doc. 21).

## II. STANDARD UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

A complaint filed in federal court must contain a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Rule 8 does not require "detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Nevertheless, it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint that relies on "naked assertion[s]" devoid of "further factual enhancement,"

9

"labels and conclusions," or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 557.

Before filing an answer, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (further citation omitted). Courts assess "plausibility" by "'draw[ing] on [their own] judicial experience and common sense.'" *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679) (first alteration in original). Also, courts "'review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.'" *Id.* (quoting *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n.4 (8th Cir. 2010)).

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "The Court must also grant all reasonable inferences from the pleadings in favor of the nonmoving party." *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, No. 23-CV-33-CJW-MAR, 2023 WL 6163487, at *2 (N.D. Iowa Sept. 21, 2023) (quotations and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility is not equivalent to probability, but it is something "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "The question . . . is not whether [a plaintiff] might at some later stage be able to prove [its claims]; the question is whether [a plaintiff] has adequately asserted facts (as contrasted with naked legal conclusions) to support his claims." *Whitney*, 700 F.3d at 1129.

"When ruling on a motion to dismiss under Rule 12(b)(6), the court is limited in

10

what it may consider." *Hotchkiss*, 2023 WL 6163487, at *3. The court may not consider matters outside the pleading when ruling on a motion to dismiss. *BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 687 (8th Cir. 2003). A matter outside the pleading is "any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings." *Gorog v. Best Buy Co.*, 760 F.3d 787, 791 (8th Cir. 2014) (quoting *Gibb v. Scott*, 958 F.2d 814, 816 (8th Cir. 1992)).

## III.    ANALYSIS

Plaintiffs bring several claims in their complaint—seven to be exact. (Doc. 1, at 13–26). Defendants' motion to dismiss challenges each of plaintiffs' seven claims. The Court will discuss each claim in turn.

### A.    Due Process

Plaintiffs call their first cause of action "State Created Danger in Violation of Substantive Due Process—Fifth and Fourteenth Amendments to the U.S. Constitution." (Doc. 1, at 13). Plaintiffs also state, in the introduction to their complaint, that "this action is brought pursuant to 42 U.S.C. § 1983." (*Id.*, at 1). Thus, the Court construes plaintiffs' first cause of action as one under Section 1983, as the parties implicitly appear to recognize in their briefing here. Specifically, the Court construes plaintiffs' claim, as it is labeled in the complaint, as one under Section 1983 for violation of plaintiffs' substantive due process rights under the theory of a state created danger. *See, e.g.*, *Hart v. City of Little Rock*, 432 F.3d 801, 804–05 (8th Cir. 2005).

Section 1983 provides, in pertinent part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]" 42

U.S.C. § 1983. A plaintiff bringing a claim under Section 1983 must prove three elements: "(1) violation of a constitutional right, (2) committed by a state actor, (3) who acted with the requisite culpability and causation to violate the constitutional right." *Hart*, 432 F.3d at 804 (quotation omitted).

Plaintiffs rely on the Fourteenth Amendment's Due Process Clause as the constitutional right defendants violated, which provides that a State must not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Due Process Clause generally does not provide a cause of action for 'a State's failure to protect an individual against private violence.'" *Montgomery v. City of Ames*, 749 F.3d 689, 694 (8th Cir. 2014) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)). Under Eighth Circuit precedent, however, "the Constitution requires a State to protect a person in two circumstances: when the person is in the State's custody, and when the State created the danger to which the individual is subjected." *Id.* Plaintiffs' claim comes under the second circumstance, the so-called "state-created danger" theory. To succeed under the state-created danger theory, plaintiffs must allege facts which show:

> (1) that [Angela] was a member of a limited, precisely definable group, (2) that the municipality's conduct put her at a significant risk of serious, immediate, and proximate harm, (3) that the risk was obvious or known to the municipality, (4) that the municipality acted recklessly in conscious disregard of the risk, and (5) that in total, the municipality's conduct shocks the conscience.

*Id.* at 694–95 (quoting *Fields v. Abbott*, 652 F.3d 886, 890 (8th Cir. 2011)).

Defendants argue this claim should be dismissed, largely based on the United States Supreme Court case *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005). *Castle Rock* dealt with a similarly tragic situation as here involving a husband and a wife, as well as their children. In that case, the state trial court had issued a temporary

restraining order commanding the husband not to "molest or disturb the peace of [respondent] or of any child," and to stay "at least 100 yards from the family home at all times." *Id*. at 751. Later, the restraining order was made permanent and modified to give the husband the right to spend some time with the children. *Id*. at 752. One night, the husband took the children while they were playing outside. This was not one of the nights he could see the children. At 7:30 PM, the wife called the police, who sent two officers to her house, and, after being shown the restraining order, the police told the wife there was nothing they could do and suggested she call back at 10:00 PM if the children were not yet home. *Id*. at 753. At 8:30 PM, the husband told the wife on the phone that he had the children at an amusement park in Denver. The wife reported this to the police, and the police again told her to wait until 10:00 PM to see if the husband would return with the children. *Id*. At 10:10 PM, the wife again called the police when the children had not been returned, but the police told her to wait until midnight. At midnight, the wife went to the husband's apartment, but nobody was there, so she again called the police, who told her they were sending an officer. *Id*. No officers arrived, and the wife went to the police station at 12:50 AM. The wife submitted an incident report, but the officer who took the report "made no reasonable effort to enforce the [restraining order] or locate the three children. Instead, he went to dinner." *Id*. at 754. At 3:20 AM, the husband arrived at the police station with a gun and opened fire. *Id*. The police shot back and killed the husband. The children were found dead in the back of the husband's truck—the husband had already murdered them. *Id*. The wife sued the town and three officers under Section 1983 for a due process violation. *Id*. The defendants filed a motion to dismiss for failure to state a claim. *Id*. The case eventually made its way to the Supreme Court.

Precisely how the *Castle Rock* case made its way to the Supreme Court is important here. The district court granted the defendants' motion to dismiss, concluding that the

13

wife failed to state a claim under both the substantive due process and procedural due process aspects of the claim. *Id.* The Court of Appeals for the Tenth Circuit agreed with the district court regarding the substantive due process claim, but reversed on the wife's procedural due process claim. *Id.* Upon rehearing en banc, the Court of Appeals reached the same disposition, holding that the wife adequately stated a procedural due process claim but failed to state a substantive due process claim. *Id.* at 754–55. Then, the Supreme Court granted certiorari and agreed to hear the town's appeal. Thus, the only claim at issue in *Castle Rock*, as far as the Supreme Court was concerned, was the wife's procedural due process claim. The Court's opinion only discusses the issue in terms of the "procedural component of the Due Process Clause[.]" *Id.* at 756. Indeed, the Court's opinion discusses the prior case of *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), noting that the *DeShaney* Court's holding applied to substantive due process claims, but also noting that the *DeShaney* Court left the issue undecided under a procedural due process challenge. *Castle Rock*, 545 U.S. at 755–56. The Supreme Court's opinion in *Castle Rock*, then, is generally only relevant to a procedural due process claim.[7]

Plaintiffs' claim here, at least on its face, is a claim for a violation of the substantive aspect of the Due Process Clause. (*See* Doc. 1, at 13). Some of plaintiffs' arguments in their brief, however, blur the lines to a degree. Plaintiffs attempt to distinguish *Castle Rock*, in one of several ways, by arguing that Iowa's statute concerning the enforcement of restraining orders indeed mandates arrests upon probable cause. (*See*

---

[7] The *Castle Rock* opinion does state: "In light of today's decision and that in *DeShaney*, the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its 'substantive' manifestations." 545 U.S. at 768. In context, this means that *DeShaney* decided the issue under substantive due process, and *Castle Rock* decided the issue under procedural due process.

Doc. 24, at 16–19). This would only be relevant to a procedural due process claim, not a substantive due process claim. Thus, although the Court understands plaintiffs' claim here to be one for a violation of substantive due process, because some of plaintiffs' arguments touch on aspects of a procedural due process claim, the Court will quickly address plaintiffs' claim as if it were also one under the procedural aspect of the Due Process Clause. The Court will then turn to plaintiffs' substantive due process claim.

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount." *Bd. Of Regents of State Colls. v. Roth*, 408 U.S. 564, 569–70 (1972). Further, "[t]he Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Id.* at 576. The Supreme Court has recognized "interests" protected by procedural due process such as the continued receipt of welfare benefits, *see Goldberg v. Kelly*, 397 U.S. 254 (1970), and continued employment of a public college professor who was entitled to tenure under state statute, *see Slochower v. Board of Higher Education of City of New York*, 350 U.S. 551 (1956). These protected property interests "are not created by the Constitution" but instead by "existing rules or understandings that stem from an independent source such as state law[.]" *Roth*, 408 U.S. at 577.

The plaintiff in *Castle Rock*—the wife—claimed "she had a property interest in police enforcement of the restraining order against her husband; and that the town deprived her of this property without due process by having a policy that tolerated nonenforcement of restraining orders." 545 U.S. at 755. That is, the wife argued that state law, which on its face provided that officers "shall arrest" a person who has violated a restraining order, created a property interest—her property interest—entitling her to

15

have the police arrest her husband when he violated the restraining order.[8]  The Supreme Court rejected this argument on two main grounds.  First, the Court concluded that the statute did not truly make arrest mandatory upon violation of a restraining order, largely based on a "well established tradition of police discretion" which has "long coexisted with apparently mandatory arrest statutes."  *Id.* at 760.  The Court also held that, even if the statute did create a mandatory arrest duty, it "would not necessarily mean that state law gave [the wife] an entitlement to enforcement of the mandate."  *Id.* at 765 (emphasis omitted).  That is, even if the officers had a duty to arrest the husband, that duty was not owed specifically to the wife; or, at least, the wife did not have a specific entitlement to enforce the officers' hypothetical duty.  In short, the wife did not have a property interest protected by the procedural aspect of the due process clause.  *See id.* at 765–68.

Plaintiffs' claim here, construing it as a procedural due process claim, is foreclosed by *Castle Rock*.  The Supreme Court in *Castle Rock* held that the plaintiff "did not, for purposes of the Due Process Clause, have a property interest in police enforcement of the restraining order against her husband."  *Id.* at 768.  Nothing about the facts here distinguish this case from *Castle Rock* to warrant a different conclusion.  Plaintiffs did not have a property interest in police enforcement of the restraining order against Christopher, and thus any claim under the procedural aspect of the due process clause must fail.

Turning back to the substantive aspect of due process—the claim that plaintiffs truly appear to bring here—plaintiffs also fail to state a claim under this theory.

---

[8] The wife in *Castle Rock* characterized her property interest in various ways, as an "entitlement to receive protective services;" an "interest in police enforcement action;" a "specific government benefit consisting of the government service of enforcing the objective terms of the court order protecting her and her children against her abusive husband;" and the "mandated . . . arrest of [the husband] under specified circumstances, or at a minimum . . . the use of reasonable means to enforce the order."  545 U.S. at 763 n.9 (cleaned up).

Generally, the Due Process Clause confers "no affirmative right to governmental aid[.]" *DeShaney*, 489 U.S. at 196. Further, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.* at 200.

As noted above, however, one exception relevant here is the so-called state-created danger theory. To state a claim under this theory, plaintiffs must allege facts showing:

> (1) that [Angela] was a member of a limited, precisely definable group, (2) that the municipality's conduct put her at a significant risk of serious, immediate, and proximate harm, (3) that the risk was obvious or known to the municipality, (4) that the municipality acted recklessly in conscious disregard of the risk, and (5) that in total, the municipality's conduct shocks the conscience.

*Montgomery*, 749 F.3d at 694–95.

Plaintiffs' problem here is the second element. Plaintiffs' factual allegations in the complaint fail to show that defendants' conduct "put [Angela] at a significant risk of serious, immediate, and proximate harm[.]" *Id.* at 694. Or, as defendants put it, they "had no control over all the factors that may have ultimately led to [Angela's] murder." (Doc. 21-1, at 9).

In the *DeShaney* case, for example, the plaintiff was a four-year-old boy whose father had beaten and injured him. The defendants were social workers and local officials who had received ongoing reports for a period of many months that the father was abusing the boy, but the defendants did not remove the boy from the father's care. *DeShaney*, 489 U.S. at 192–93. The father eventually beat the boy so severely that he went into a

17

coma and suffered severe brain damage. *Id.* at 193. The father was subsequently convicted of child abuse. *Id.* The boy and his mother brought a Section 1983 action against the defendants, in relevant part, based on a substantive due process liberty right violation.

The Supreme Court held that the plaintiffs in *DeShaney* could not state a claim under the substantive aspect of the Due Process Clause. The Court's conclusion generally rested on the idea that the Due Process Clause's "purpose was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196. The Court noted in particular that although "the State may have been aware of the dangers that [the boy] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201. The Court also emphasized that the plaintiff was "in no worse position than that in which he would have been had [the State] not acted at all[.]" *Id.* Thus, under *DeShaney*, when a government actor does not make a person "more vulnerable" and does not place a person in a worse position than if the government actor had not acted at all, the plaintiff cannot state a substantive due process claim.

As noted above, the Supreme Court did not analyze the substantive due process aspect of the *Castle Rock* case. But the Court of Appeals for the Tenth Circuit did when the case first went up on appeal from the district court's grant of dismissal (prior to the rehearing en banc and then grant of certiorari). *See Gonzales v. City of Castle Rock*, 307 F.3d 1258, 1262–63 (10th Cir. 2002), *reh'g granted*, 307 F.3d 1258 (10th Cir. 2004). The court held that the plaintiff could not state a substantive due process claim under the state-created danger theory because the defendants "simply failed to act by refusing to enforce the order." *Id.* at 1263. The court noted that, although the defendants "did not reduce the danger" posed by the father's abduction of the children, the defendants' inaction also "did not create or enhance that danger." *Id.* Ultimately, the court stated

that the defendants' "lack of affirmative conduct is fatal to [the plaintiffs'] substantive due process claim." *Id.* Upon rehearing en banc, the Tenth Circuit again explained that it was "clear" that "the Constitution does not require a state to protect its citizens from third party harm," and the court accordingly noted that its prior panel opinion affirming the dismissal of the plaintiff's substantive due process claim under *DeShaney* "remains undisturbed." *Gonzales v. City of Castle Rock*, 366 F.3d 1093, 1099 n.3 (10th Cir. 2004) (en banc).

These cases show that, for a plaintiff to state a claim under the state-created danger theory, the defendant must have somehow put the plaintiff in a worse position than if the defendant had not acted at all; or, put another way, the defendant's actions must have enhanced the danger. The Court of Appeals for the Eighth Circuit recognizes the same standard. *See, e.g.*, *Hart*, 432 F.3d at 805 ("[I]f the state acts affirmatively to place someone in a position of danger that he or she would not otherwise have faced, the state actor, depending on his or her state of mind, may have committed a constitutional tort.") (alteration in original) (quotation and emphasis omitted). Thus, the ultimate issue here is whether defendants' actions made Angela more vulnerable or created extra danger for Angela.

Plaintiffs have not alleged facts showing that defendants put Angela in more danger. In fact, generally, all plaintiffs have pled is that the police did not act. Plaintiffs' allegation repeatedly show Angela reporting to the police a possible violation of the protective order, followed by the police basically doing nothing. The one affirmative act of defendants in the complaint is when they arrested Christopher for a violation of the protective order in September 2022. (Doc. 1, at 8). These facts certainly do not point to defendants creating a danger for Angela.

What plaintiffs have pointed to in support of this claim are a number of arguable violations of the protective order by Christopher, which were not acted upon by

defendants—with the exception of one time, when the police did arrest Christopher for a violation of the protective order.  Plaintiffs' allegations include the following events which occurred while the protective order was in place and which were at least arguably violations of the order, in chronological order: Christopher went to Angela's place of work and cut the grass; Christopher drove past Angela's house repeatedly one night; Christopher went to Angela's house to complain about credit cards; Christopher sent Angela text messages multiple times; Christopher left a note on Angela's steps at her home[9]; Christopher parked close by Angela and later drove by while Angela was talking with Mutzl[10]; Christopher was caught spying on Angela when Christopher was hiding in a lumberyard near Angela's sister's house; Christopher showed up where Angela was staying and told people that he did not care if he went to jail.  (Doc. 1, at 6–11).  Plaintiffs also point to the fact that, after Christopher was sentenced to six days in jail for violation of the restraining order, and Christopher did not turn himself in in time, defendants did not find and arrest Christopher for nine days.  (*Id.*, at 11).[11]  Plaintiffs also allege that

_____

[9] This is the point when the police arrested Christopher for violating the protective order, apparently on the basis of the text messages Christopher had sent Angela.  (Doc. 1, at 8).  This was also on the same day Christopher had left a note on Angela's steps.

[10] Mutzl said she was unable to observe whether Christopher was actually the driver, so it is arguable at best whether this was an example of defendants having probable cause to believe Christopher violated the restraining order.

[11] Plaintiffs also point to several instances which were clearly not violations of the protective order.  For example: Christopher "stalked" Angela's daughter-in-law at a gas station—there is no allegation that the protective order covered any people other than Angela; Christopher drove past Hancock's house in a vehicle different from Christopher's normal vehicle—again, this event concerns somebody other than Angela; Christopher told Kloft, a defendant here, that Angela had a boyfriend—this is clearly not a violation of the protective order, and any conclusions plaintiffs draw from this are merely conclusions, not alleged facts; Christopher placed signs in his shop on a main street in the town making negative comments about Angela—it is unclear how this would be a violation of the protective order.  (Doc. 1, at 6–10).  Plaintiffs also point to times

20

Christopher had performed electrical services for some of the defendants on a reduced fee or for free. (*Id.*, at 12).

None of these facts lead to the conclusion that defendants created a danger for Angela. The facts alleged generally point instead to inaction on the part of defendants. Plaintiffs argue that defendants "protected" Christopher by not arresting him, even though defendants "were aware of the likelihood of [Christopher] committing violence" against Angela. (*Id.*, at 13). But in *DeShaney*, the defendants were certainly aware of the potential violence the boy was facing, did nothing about it, and the boy still could not state a claim against the defendants for violation of his due process rights. In fact, in *DeShaney*, the defendants had taken the boy out of the abusive father's custody, and later placed the boy back in the father's custody. 489 U.S. at 192. Even when the defendants place the injured party back in the home with the known abuser, the Supreme Court held that the defendants "placed [the boy] in no worse position than that in which he would have been had [the defendants] not acted at all[.]" *Id.* at 201. Defendants here may have been aware that Christopher was likely violating the no-contact order, but defendants did not put Angela in a worse position than she would have been if defendants did not act at all. As explained above, plaintiffs generally point to defendants not acting at all. The one affirmative act defendants are alleged to have made was arresting Christopher. Plaintiffs do not argue that arresting Christopher placed Angela in danger. Arguments that defendants should have arrested Christopher more often constitute complaints that defendants did not act. Again, this does not rise to the level of a state-created danger

---

when Christopher did not show up for court hearings or times when court proceedings were continued. It is unclear how defendants could be held responsible for these things. Notably, however, even if all of these events could be considered violations of the protective order, it does not change the Court's analysis. Even in the events which were very likely not violations of the protective orders, all plaintiffs can point to is inaction on the part of defendants.

because defendants' failure to act did not place Angela in a worse position than she would have otherwise found herself.

Further, in the Tenth Circuit's panel opinion in *Castle Rock*, discussed above, the court noted that although the defendants "did not reduce the danger" posed by the father's abduction of the children, the defendants' inaction also "did not create or enhance that danger." 307 F.3d at 1263. Ultimately, that court stated that the defendants' "lack of affirmative conduct is fatal to [the plaintiffs'] substantive due process claim." *Id*. The same can be said here. Ultimately, defendants' "lack of affirmative conduct" is fatal to plaintiffs' claim.

Plaintiffs cite several cases in support of their argument, each of which is distinguishable from the facts here. *Freeman v. Ferguson* includes facts quite similar to the facts here. 911 F.2d 52, 53–54 (8th Cir. 1990). The court held that the plaintiff's allegations were insufficient, but because the Supreme Court had filed its opinion in *DeShaney* during the pendency of the *Freeman* case, the Eighth Circuit concluded "that equity and fairness require that appellant be granted the right to amend her complaint" in response to the law established in *DeShaney*. *Id*. at 55. The court noted that any amended complaint may still be inadequate. *Id*. Thus, the only concrete holding in *Freeman* is that the plaintiff's original complaint failed to state a claim, but that she should be able to amend the complaint. This does not help plaintiffs here.

Plaintiffs also cite *Pena v. DePrisco*, 432 F.3d 98 (2d Cir. 2005). *Pena* involved a drunk off-duty police officer driving and killing pedestrians, whose representatives brought suit against other officers who were with the driving officer when the officer was drinking. The court held, "to the extent that the plaintiffs allege merely that the individual defendants failed to intercede on the day of the accident, their complaints do not involve sufficient affirmative acts to violate substantive due process rights." *Id*. at 110. The court came to the same conclusion regarding the driving officer's supervisors, who had

22

allegedly done nothing to punish the driver's previous misconduct, much of which involved drinking. *Id.* The court noted that a "failure to interfere when misconduct takes place, and no more, is not sufficient to amount to a state *created* danger." *Id.* (emphasis in original). Other defendants in *Pena*, in contrast, had allegedly encouraged the driving officer to drink excessively and drive in that condition, and one even asked the drunk driving officer to drive him around on the day of the accident. *Id.* at 110–11. The court held that the plaintiffs' substantive due process rights were violated by these second set of defendants, because the defendants' actions helped create more danger. *Id.* at 111.

Here, defendants did not intervene, much like the first set of defendants in *Pena*. Defendants did not encourage Christopher or act in concert with Christopher, unlike the second set of defendants in *Pena*. Thus, defendants here are more akin to the set of defendants in *Pena* against whom the plaintiffs could not state a claim.

The case which provides the most support for plaintiffs' argument is *Okin v. Village of Cornwall-On-Hudson Police Department*, 577 F.3d 415 (2d Cir. 2009). In *Okin*, the plaintiff's boyfriend repeatedly harassed and beat the plaintiff. The plaintiff made repeated reports to the defendant police officers, but the officers never arrested the boyfriend. One of the times the police showed up at the couple's residence following a report of domestic violence, the officer and the boyfriend started talking about sports. *Id.* at 430. The boyfriend had also told one of the defendant officers that he could not help smacking the plaintiff around. *Id.* The court held that a reasonable factfinder could conclude that the defendants' actions could be considered "affirmative conduct that created or increased the risk of violence to the victim." *Id.*

Again, the difference between the defendants in *Okin* and defendants here is that the *Okin* officers arguably acted in an affirmative way. The officers showed up at the house with the plaintiff and the boyfriend present, and started discussing sports with the boyfriend. The officers also were told by the boyfriend that he could not help smacking

the plaintiff around. These communications with the boyfriend, at least according to the court, communicated to the boyfriend implicitly that his actions were permissible. *Id.* The court explained that the plaintiff "would be more vulnerable once [the boyfriend] was aware of the officers' dismissive and indifferent attitude toward [the plaintiff's] complaints, as such awareness nullifies the deterrent capacity of police response." *Id.* The court went on: "The implied message of the officers' conduct may have galvanized [the boyfriend] to persist in violent encounters with [the plaintiff]." *Id.* This, in the court's eyes, was the potential due process violation.

Here, plaintiffs allege no such facts. Plaintiffs argue that the officers' failure to act emboldened Christopher in believing he would not be held accountable for his wrongful conduct. (Doc. 24, at 9). The problem with this argument is that the complaint does not allege facts showing Christopher was aware that the officers were aware of his purported violations of the no contact order. Angela, and perhaps others, alerted defendants of possible violations, but no facts establish that Christopher was aware Angela was complaining to the police about him. Thus, Christopher cannot have been emboldened by the lack of police response if he was unaware that they were not responding to her complaints. Unlike in *Okin*, defendants here did not have an interaction with Christopher where he admitted to any violations. Defendants did not show up after a reported domestic violence incident and start talking with Christopher about something arbitrary like sports. Further distinguishing the facts here from those in *Okin* is the fact that defendants here actually arrested Christopher one time for violation of the protective order. Indeed, the only time Christopher was clearly aware of Angela's complaints— when she complained about him texting her—the officers arrested him. That hardly emboldened Christopher in believing he would not be held accountable for his wrongful conduct. In short, defendants here did nothing to signal to Christopher that they

"implicitly but affirmatively encouraged [Christopher's] domestic violence," as the court found the defendants did in *Okin*.[12]

In sum, plaintiffs' substantive due process claim fails because defendants did not act to put Angela in a more dangerous situation. The Court is not necessarily endorsing the officers' alleged actions—or, more accurately, inaction—here. This does not mean, however, that defendants' conduct rises to the level of a due process violation. The *DeShaney* Court's words are quite relevant here:

> Judges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for [the plaintiffs] to receive adequate compensation for the grievous harm inflicted upon them. But before yielding to that impulse, it is well to remember once again that the harm was inflicted not by the State of Wisconsin, but by [the plaintiff's] father. The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them.

*DeShaney*, 489 U.S. at 202–03. The same can arguably be said here; that is, in hindsight, it is easy to criticize the officers and argue they could have or should have acted differently. But they were not acting with the benefit of hindsight. There is certainly sympathy for plaintiffs and their decedent—what happened was tragic. But Christopher killed Angela—these defendants did not. Instead, defendants allegedly mostly stood by

---

[12] Also, notably, *Okin* is a second circuit opinion, and only persuasive authority. Even though *Okin* is distinguishable from the facts here based on the reasons stated above, the Court also notes that plaintiffs have not pointed to any Eighth Circuit precedent which goes nearly as far as *Okin*. *Okin* extends the state-created danger theory to what appears to be the outer limits—probably further than the theory should be stretched, in this Court's opinion. Even so, the facts here are dissimilar enough to distinguish *Okin* if the Court were to accept the *Okin* case's reasoning as persuasive. To be clear, though, the Court does not find *Okin* persuasive. The Court of Appeals for the Third Circuit appears to have also taken a different path than that in *Okin*, essentially summarily rejecting a similar claim under facts which arguably show more affirmative acts by the defendant officers than the acts of the officers in *Okin*. *See Burella v. City of Philadelphia*, 501 F.3d 134, 140–41 (3d Cir. 2007).

and did nothing when they arguably could have taken a more active role. Even if defendants' conduct was not necessarily the best option in hindsight, it does not rise to the level of a due process violation.[13]

Thus, defendants' motion to dismiss is **granted** as to plaintiffs' Count I.

### B. *Violation of Express Statutes Regarding No Contact Orders*

Plaintiffs' second cause of action is entitled "Violation of Express Statutes Regarding No Contact Orders Protected by Article I, Section 9 of the Iowa Constitution." (Doc. 1, at 16). Plaintiffs specifically list Iowa Code Sections 236.11 and 664A.6 as the statutes defendants violated. (*Id.*, at 17).

Defendants argue this claim fails because "direct constitutional claims against Iowa municipalities are no longer viable" after *Burnett v. Smith*, 990 N.W.2d 289 (Iowa 2023) overturned *Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017). (Doc. 21-1, at 10). Defendants also argue that the statutes on which plaintiffs base their claim—Iowa Code Sections 236.11 and 664A.6—do not provide a private cause of action for failure to enforce no contact orders. (Doc. 21-1, at 11). Plaintiffs argue the statutes "expressly allow private rights of action against law enforcement officers who in bad faith and/or willfully and/or wantonly fail to enforce restraining orders." (Doc. 24, at 25).

---

[13] The Court remains skeptical that more aggressive conduct by the officers would have changed anything. Plaintiffs speculate that, had the officers arrested Christopher more often, it would have prevented Angela's murder. Arguably, one could equally speculate that it was the officers' arrest of Christopher for violating the no-contact order that angered him enough to kill Angela. His failure to appear for the hearing and failure to surrender for a jail sentence arguably suggests that he was angry about being held accountable for violating the no-contact order. And even if officers had arrested him sooner for violations or to serve his sentence, it would have, at best, been a temporary fix. For his violation, Christopher was sentenced to six days in jail. If he wanted to murder Angela, he needed only wait those six days. This illustrates the horrible predicament victims of domestic violence face, because no contact orders, even when enforced, hardly carry with them the weight of punishment that serves as much of a deterrence for a person bent on violence.

Section 236.11 includes several parts. First, it provides that an officer "shall use every reasonable means to enforce . . . a temporary or permanent protective order." Iowa Code § 236.11(1). It also provides that, if an officer "has probable cause to believe that a person has violated . . . a temporary or permanent protective order . . . the peace officer shall take the person into custody[.]" *Id.* If the officer is unable to take the violator into custody within twenty-four hours of making the probable cause determination, then the statute gives the officer several options: request a judge determine whether a show cause order or arrest warrant should be issued, or refer the matter to the county attorney. *Id.* § 236.11(2). Finally, the fourth subsection provides: "A peace officer shall not be held civilly or criminally liable for acting pursuant to this section provided that the peace officer acts in good faith, on probable cause, and the officer's acts do not constitute a willful and wanton disregard for the rights or safety of another." *Id.* § 236.11(4). Iowa Code Section 664A.6 essentially says the same thing—i.e., upon probable cause of a violation of a no-contact order, an officer "shall" take the person into custody, and an officer "shall not be held civilly or criminally liable for acting pursuant to this section provided" the officer acts in good faith, on reasonable grounds, and the officer's acts are not in "willful or wanton disregard for the rights or safety of another."

These statutes do not create a private cause of action. They set out a standard for officers to follow. The applicable standard here is that, if an officer has probable cause to believe a protective order has been violated, the officer is to take the person into custody. Iowa Code § 236.11(1). The statutes also provide immunity for officers if they act according to the statute and the officer's actions satisfy certain other standards. *Id.* § 236.11(4). The statutes do not explicitly allow private causes of action to enforce the statute, as plaintiffs argue. The Iowa legislature knows how to create a private cause of action. Defendants point to several examples, including Iowa Code Sections 708.7(7) and 714H.5. (Doc. 21-1, at 11). Section 708.7(7) provides: "A person injured by a

27

violation of subsection 1, paragraph 'a', subparagraph (4), may bring a civil action against the person whose conduct violated subsection 1, paragraph 'a', subparagraph (4)." Section 714H.5(1) begins with the following sentence: "A consumer who suffers an ascertainable loss of money or property as the result of a prohibited practice or act in violation of this chapter may bring an action at law to recover actual damages." These statutes show how the legislature can provide a private cause of action by stating that a party injured by another party's violation of the statute can sue to obtain a remedy—usually damages. Sections 236.11 and 664A.6—the statutes on which plaintiffs base their claim here—do not include similar language.

Plaintiffs point to the immunity from liability aspect of the statutes and reason that, because of the immunity language, the statutes provide a private cause of action. The logic appears to be that the statutes' provision of immunity from liability so long as officers act a certain way means that a cause of action is available to plaintiffs if the officers do not act in conformity with the requirements for immunity. Plaintiffs misunderstand the statute. The immunity clause is to protect officers from liability from the arrestee when officers *act* consistent with the statute. It does not create a cause of action when officers *fail to act*. At most, perhaps, the statutes establish a standard of care for certain causes of action. Fundamentally, plaintiffs miss a step here. A cause of action cannot be brought based solely on the absence of immunity or a purported breach of a standard of care. There must be a legal basis for a cause of action. Plaintiffs have not pointed to a source for their cause of action on this front. Instead, plaintiffs have pointed to statutes which tell officers what to do and provide immunity under certain situations. The statutes do not provide plaintiffs with a private cause of action here. Plaintiffs also have not identified any case where a court interprets these statutes as creating a cause of action.

Thus, defendants' motion to dismiss is **granted** as to plaintiffs' Count II.

28

### C.    *Intentional Infliction of Emotional Distress*

Plaintiffs' third cause of action is for intentional infliction of emotional distress. (Doc. 1, at 18–19).  In Iowa, this claim includes four elements:

> (1) the defendants engaged in extreme and outrageous conduct; (2) the defendants intentionally caused, or recklessly disregarded the likelihood of causing, severe or extreme emotional distress to the plaintiff; (3) the plaintiff in fact suffered severe or extreme emotional distress; and (4) the defendants' extreme and outrageous conduct was the actual and proximate cause of the severe or extreme emotional distress.

*White v. Harkrider*, 990 N.W.2d 647, 652 (Iowa 2023).  In order for defendants' conduct to be actionable, "the allegedly tortious conduct must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Id.* (quoting *Fuller v. Loc. Union No. 106 of the United Brotherhood of Carpenters & Joiners*, 567 N.W.2d 419, 423 (Iowa 1997)). Whether the defendants' conduct may "reasonably be regarded as outrageous" is a matter of law for the court to determine.  *Id.* (quoting *Hedlund v. State*, 930 N.W.2d 707, 724 (Iowa 2019)).  "Because the determination of whether conduct is sufficiently outrageous to permit recovery is a legal question, a claim of intentional infliction of emotional distress can be resolved at the motion to dismiss stage in those cases where the allegations in the petition, when taken as true, do not assert legally outrageous conduct."  *Id.* at 653.

Defendants challenge two elements of plaintiffs' claim.  First, defendants argue that plaintiffs' factual allegations do not show that defendants "acted with the intent to cause, or with reckless disregard of the likelihood of causing, severe emotional distress." (Doc. 21-1, at 13).  Next, defendants argue that their conduct was not outrageous, challenging plaintiffs' allegations on the first element of the claim.  (*Id.*, at 13–14). Plaintiffs argue in response that defendants' "repeated refusal to enforce a restraining [order] and an arrest warrant against one of their friends is exactly the type of outrageous

conduct the tort of intentional infliction of severe emotional distress is designed to cover."
(Doc. 24, at 25–26).

Defendants' alleged conduct here does not meet the "high standard" of "extreme and outrageous" conduct required for plaintiffs to state a claim. *White*, 990 N.W.2d at 653. Plaintiffs point to a district court ruling in a case which was later appealed where the court of appeals upheld the jury's verdict that the plaintiff had established a claim of intentional infliction of emotional distress. *Atzen v. Atzen*, No. 15-0368, 2018 WL 1433537 (Iowa Ct. App. Mar. 21, 2018). But in *Atzen*, the plaintiff's claim was that the defendant waged a months-long campaign to intimidate and humiliate the plaintiff. *See id.* at *6 ("[Plaintiff] alleged [defendant] filed exaggerated and false police reports, urged police and prosecutors to criminally charge [plaintiff] without probable cause, contacted people in the community about the allegations including false claims that [plaintiff] threatened [defendant's] eight-year-old son, tried to intervene in [plaintiff] and [plaintiff's ex-husband's] custody proceedings, shared [plaintiff's] mug shot in the community, abused the [no-contact order ("NCO")] in an effort to block [plaintiff] from attending her children's events, and induced [plaintiff] to violate the NCO at a basketball team lunch."). The defendant's conduct in *Atzen* was considered outrageous, in large part, because of her *actions*.

Here, in contrast, plaintiffs largely point to defendants' *inaction* in support of their argument. Plaintiffs point to defendants' alleged refusal to enforce the restraining order as the main thrust of defendants' purportedly "outrageous" conduct. Defendants here simply did not commit outrageous conduct. Even if defendants could have taken a different path in hindsight, their conduct was still not outrageous, as that word is understood in the context of intentional infliction of emotional distress claims. Moreover, plaintiffs' argument—that defendants were friends with Christopher—exceeds the facts plaintiffs allege, which, at most, assert that at some unstated time Christopher provided

electrical work for free or at a reduced rate for some of the unidentified defendants. The alleged facts, even taken as true and assuming the work was performed at some time close to the murder, are a far cry from establishing that any of defendants were friends with Christopher.

Thus, defendants' motion to dismiss is **granted** as to plaintiffs' Count III.

### D.     Action on the Bond

Plaintiffs' call their next cause of action "Action On the Bond," citing the Iowa Constitution Article XI, Section 5; Iowa Code Chapters 63 and 64; and Bellevue city code sections. (Doc. 1, at 19–21). Plaintiffs state that defendants' "bonds should be forfeited for the use and benefit of Plaintiffs" under Iowa Code Section 64.18. (*Id.*, at 20–21).

Defendants challenge plaintiffs' claim for action on the bond on multiple grounds. Defendants argue that Iowa Code Chapter 64 is focused on record-keeping and preventing misappropriation of government funds, and not a workaround to recover for alleged tortious conduct or constitutional violations. (Doc. 21-1, at 15–16). Defendants next argue that they are not "public officers" as used in Chapter 64—meaning the bond statutes would not apply to them. (*Id.*, at 16). Defendants further argue that bonds under Chapter 64 "are not subject to forfeiture," citing *State ex rel. Switzer v. Overturff*, 33 N.W.2d 405, 408 (Iowa 1948). (Doc. 21-1, at 16–17). Finally, defendants argue that plaintiffs' claim fails to meet the heightened pleading standard under Iowa Code Section 670.4A, particularly noting that plaintiffs cannot point to any cases or statutes showing that the cause of action is "clearly established." (Doc. 21-1, at 17).

Plaintiffs argue that action on the bond "is a remedy recognized at common law in Iowa at the time of the adoption of the Iowa Constitution in 1857, based upon an express statute and an express constitutional provision." (Doc. 24, at 26). Plaintiffs point to the fact that the Iowa Constitution and statutes require officers to swear an oath

31

to support the Constitution. Plaintiffs also note that public officers generally must give bond under the condition that the officer will "discharge all duties now or hereafter required by the office by law." (*Id.*, at 27) (citing Iowa Code § 64.2(1)). Plaintiffs argue that Iowa Code Section 63.11 "requires the oath be subscribed on the bond" and that Iowa Code Section 64.3 "allows actions on the bond for a 'person injured or sustaining loss.'" (*Id.*) (citing Iowa Code § 64.3(4)).

The Court will first focus on defendants' third argument, which is that these bonds are not subject to forfeiture. Defendants cite *Switzer* in support. 33 N.W.2d at 408. In that case, the Iowa Supreme Court stated the following regarding official bonds:

> These provisions are quite inconsistent with any intention of making the bonds forfeitable either for violation of the general requirement "that he will faithfully and impartially, without fear, favor, fraud, or oppression, discharge" his duties, or for breach of any of the other conditions. Ouster proceedings and criminal procedure are the provisions for punishing officers who violate their duties or are guilty of misconduct. The official bond is for the purpose of indemnifying the obligee or any person suffering injury or loss by reason of official malfeasance, misfeasance or nonfeasance.

*Id.* (internal citations omitted). Part of the *Switzer* court's reasoning was that boards of supervisors had the option to fix a larger amount of a bond in different counties. *See id.* If forfeiture of a bond was allowed as a remedy for breach of a condition, then boards of various counties would be fixing different levels of penalties for any official wrongdoing, and officials would have been punished, so to speak, at different monetary levels simply depending on the county in which they served. Instead, the court held that these bonds "stand as security for funds lost or destroyed without any suggestion of fault or negligence . . . on the part of the officer in whose custody they belonged." *Id.* at 409. The court noted that, if it held otherwise, the bond statutes would in effect be a type of liquidated damages. The court rejected this. *See id.*

In their complaint, plaintiffs request that the defendants' bonds be "forfeited for the use and benefit of Plaintiffs[.]" (Doc. 1, at 20). This would be a type of liquidated damage, as the court rejected in *Switzer*. Plaintiffs' claim therefore cannot stand.

Because plaintiffs' claim fails on defendants' third argument, the Court need not address the other arguments of the parties. However, as an alternative ground, the Court also agrees with defendants' first argument here. The language of the chapter in general, and particularly Iowa Code Section 64.2, is largely about misappropriating funds and the like. It is not a general negligence statute, as plaintiffs attempt to use it here.

Finally, one of plaintiffs' arguments includes the claim that "Iowa Code [Section] 64.3 allows actions on the bond for a 'person injured or sustaining loss.'" (Doc. 24, at 27) (citing Iowa Code § 64.3(4)). But section 64.3 is all about insurance policies in lieu of a bond. For starters, the section is entitled "Insurance policy in lieu of bond." And the subsection plaintiffs cite discusses the use and benefit of insurance policies obtained pursuant to the other provision of section 64.3. Thus, the Court rejects plaintiffs' contention that Iowa Code Section 64.3 "allows actions on the bond."

Thus, defendants' motion to dismiss is **granted** as to plaintiffs' Count IV.

### E. *Iowa Slayer Act*

Plaintiffs bring their next cause of action for violation of the Iowa Slayer Act. (Doc. 1, at 21–24). Plaintiffs point to Iowa Code Section 633.535(1), which provides:

> A person who intentionally and unjustifiably causes or procures the death of another shall not receive any property, benefit, or other interest by reason of the death as an heir, distributee, beneficiary, appointee, or in any other capacity whether the property, benefit, or other interest passed under any form of title registration, testamentary or nontestamentary instrument, intestacy, renunciation, or any other circumstance. The property, benefit, or other interest shall pass as if the person causing death died before the decedent.

Case 2:24-cv-01012-CJW-KEM   Document 31   Filed 10/21/24   Page 33 of 36

This statutory provision does not apply to defendants here. The slayer act bars a person who causes or procures the death of another from receiving certain property or benefit. Plaintiffs have not identified any property or benefit which defendants have received here. Thus, even if plaintiffs could enforce the slayer act against certain individuals who may be in possession of certain property, defendants are not those individuals.

Thus, defendants' motion to dismiss is **granted** as to plaintiffs' Count V.

### F.    *Trespass on the Case*

Plaintiffs' next cause of action is trespass on the case. (Doc. 1, at 24–25). The Iowa Supreme Court has explained that "trespass on the case was at common law, an action to recover damages that are not the immediate result of a wrongful act but rather a later consequence." *Miranda v. Said*, 836 N.W.2d 8, 17 n.7 (Iowa 2012) (cleaned up). The court also noted that "[t]respass on the case is often credited as the theoretical progenitor of negligence." *Id.* *See also Trespass*, *Black's Law Dictionary* (12th ed. 2024) (noting that trespass on the case "was the precursor to a variety of modern-day tort claims, including negligence, nuisance, and business torts").

As early as 1936, the Iowa Supreme Court discussed trespass on the case in the past tense. In *New York Life Insurance Co. v. Clay County*, the court noted that trespass on the case "was a form of action which included a large variety of torts, Negligence, Malicious Prosecution, Defamation and many others." 267 N.W. 79, 81 (Iowa 1936).

Clearly this cause of action—if it can be called a cause of action—has long been abandoned in Iowa law. The cases plaintiffs point to concerning trespass on the case all come from the mid-nineteenth century or earlier. *See, e.g.*, *Eddy v. Wilson*, 1 Greene 259, 1848 WL 209 (Iowa 1848); *Zerfing v. Mourer*, 2 Greene 520, 1850 WL 171 (Iowa

1850). Trespass on the case is no longer available as a cause of action, and therefore plaintiffs' claim based upon it must fail.[14]

Thus, defendants' motion to dismiss is **granted** as to plaintiffs' Count VI.

### G. *Loss of Consortium*

Plaintiffs' final cause of action is for loss of consortium. (Doc. 1, at 25–26). The parties each recognize that this is a derivative claim which depends on the validity of plaintiffs' other claims. (Docs. 21-1, at 20–21; 24, at 29). This claim survives only if any of plaintiffs' other claims survive, and it fails if all of the other claims fail. The Court has concluded that all of plaintiffs' other claims fail. Thus, this claim must also fail.

Thus, defendants' motion to dismiss is **granted** as to plaintiffs' Count VII.

---

[14] It is not entirely clear to the Court why plaintiffs bring this archaic cause of action. It appears, however, that plaintiffs believe it is material that trespass on the case was recognized as a form of action at the time the Iowa Constitution was ratified in 1857. (*See* Doc. 24, at 27). Plaintiffs seem to suggest this is relevant due to the effects of the Iowa Supreme Court's refusal to recognize a "standalone cause of action for money damages under the Iowa Constitution" in *Burnett*. 990 N.W.2d at 307. Plaintiffs state that, despite that holding, "*Burnett* specifically authorized claims against law enforcement 'recognized at common law at the time of the adoption of the Iowa Constitution, or based upon an Iowa statute, or the express terms of a provision of the Iowa Constitution.'" (Doc. 24, at 23) (citing *Burnett*, 990 N.W.2d at 307). But plaintiffs misquote *Burnett*. The *Burnett* court said nothing about claims "recognized . . . at the time of the adoption of the Iowa Constitution" in the passage plaintiffs misquote. Instead, the court stated that they "no longer recognize a standalone cause of action for money damages under the Iowa Constitution unless authorized by the common law, an Iowa statute, or the express terms of a provision of the Iowa Constitution." *Burnett*, 990 N.W.2d at 307. Whether a claim was recognized in 1857 is irrelevant. The only issue is whether plaintiffs can bring the claim under Iowa law in 2024.

## IV.    CONCLUSION

For the reasons stated above, the Court **grants** defendants' motion to dismiss. (Doc. 21).  This case is dismissed in its entirety.

**IT IS SO ORDERED** this 21st day of October, 2024.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa

Case 2:24-cv-01012-CJW-KEM   Document 31   Filed 10/21/24   Page 36 of 36